1w  373
141  666

1W 373
e152  183

CHARLES H. CARROLL *v.* RANDALL S. RICE, ADMINISTRATOR OF THE ESTATE OF NEHEMIAH O. SARGEANT, DECEASED, THE PRESIDENT, DIRECTORS AND COMPANY OF THE FARMERS AND MECHANICS' BANK OF MICHIGAN, JOHN A. WELLES, CATHARINE C. SARGEANT AND LUCIUS LYON SARGEANT.

Fraud vitiates all contracts, at the election of the party injured; but he must make his election on the discovery of it, or within a reasonable time thereafter, whether he will rescind the contract, or consider it good, and resort to an action on the case for damages.

If the condition of the property has been so changed that the parties cannot substantially be placed back where they were before the sale, the vendee must seek redress by an action on the case.

A party seeking to set aside a conveyance on the ground of fraud, must be prompt in communicating the fraud when discovered, and consistent in his notice of the use he intends to make of it.

In a suit brought to set aside a bond and mortgage for purchase money, on the ground of fraud, the mortgagee being dead, and his estate insolvent unless the bond should be paid, the Court, although it refused, under the circumstances of the case, to rescind the contract, retained jurisdiction under the general prayer of the bill, on the ground that it could give more full relief than a court of law, and awarded an issue to ascertain the damage which complainant had sustained by reason of the alleged fraud.

THIS was a bill to rescind a sale of real estate, &c. The facts necessary to an understanding of the several points decided, are stated in the opinion of the Court.

*A. D. Fraser & T. Romeyn*, for complainants, contended that the contract between complainant and Sargeant was vitiated by the fraud of Sargeant in his assurances concerning the property. That misrepresentation or concealment in regard to material facts, entitles the injured party to have the transaction set aside, whether the party making the misrepresentation knew it to be false, or made his statements without knowing whether they were true or not, a person selling land being presumed to know the correctness of his representations. The title failing to part of the land, the whole sale will be rescinded.

Complainant is entitled to payment for his improvements, and is liable only for the actual rents and profits. Lapse of time is no bar to the relief sought, as the right to it does not arise completely until discovery.

*H. N. Walker and E. Farnsworth, Attorney General*, for defendants.

There was no such fraud or misrepresentation on the part of Sargeant, as to the situation, extent, and value of the property, as would, if not excused, authorize this Court to annul the contract, and compel the defendants to refund the money already paid. It must appear not only that there were misrepresentations, but that the party was misled by them.

Complainant has waited too long. The condition of the property is so changed, that the parties cannot be replaced *in statu quo*. A party seeking to set aside a conveyance on the ground of fraud, must be prompt in communicating it, when discovered, and consistent in his notice to the opposite party of the use he intends to make of it. He

Carroll *v.* Rice.

must not keep the property, to wait the chances of profit, and disavow the contract when it proves a bad bargain.

THE CHANCELLOR.   On the 28th of July, 1836, Carroll purchased of Nehemiah O. Sargeant his interest in the village of Kent, at the Rapids of Grand River.   Sargeant and Lucius Lyon were at that time joint proprietors of a large part of the village plat, and had made, and were then engaged in making divers improvements, and were the owners of considerable personal property, connected with their village speculation, as materials for building, teams, and instruments for the construction of a canal then in part completed, and the like.   They were also parties to various contracts for the sale of village lots, and the joint holders of bonds and mortgages, given for village property sold by them.   Carroll was to take Sargeant's interest in the village speculation, to succeed to all his rights, and assume all his liabilities, and to pay Sargeant $83,000,—viz: $5,000 in cash, $18,000 by a draft at ninety days on the Phœnix Bank in the city of New York, and $60,000 in twelve annual instalments of $5,000 each, with interest on each instalment when paid.   The necessary papers were executed, and possession was taken of the property by Carroll.   Sargeant died in September, 1838, and defendant, Rice, was appointed administrator of his estate.   In April, 1840, Carroll filed his bill in this Court against Rice, the administrator, Catharine C. Sargeant, the widow, and Lucius Lyon Sargeant, the only child, and heir at law, a minor under the age of twenty-one years, to have the sale of July twenty-eighth rescinded, and the securities given for the purchase money delivered up and cancelled, and to be repaid with interest what he had paid toward the purchase, on the ground of fraud in Sargeant, in misrepresenting the condition and

situation of the property at the time of the purchase; Carroll offering to account for all sales made by him.

The bill alleges, Sargeant misrepresented the property, in the following particulars, to induce complainant to purchase it.

*First.* The depth of the water in Grand River both above and below the Rapids, at which point the village of Kent is situated, and the facilities the river afforded for navigation.

*Second.* That the river did not overflow its banks at the village, in the time of freshet.

*Third.* The cost of completing the canal, which was in an unfinished state, and which, when completed as laid down on the village plat, was to extend from the head to the foot of the Rapids.

*Fourth.* The average head and fall of the water power that would be created by the canal, which he represented to be twelve feet.

*Fifth.* The amount of moneys due on contracts, for village property sold.

*Sixth.* The effect of the delivering up of a contract to John P. Calder, executing to him a deed, and taking back a mortgage, which was done by Sargeant, had upon the interests or rights of complainant.

*Seventh.* The quantity of building materials that had been provided for building a mill and tavern house, the progress that had been made in framing, what is called by the witnesses, the mammoth mill, and that machinery for it, to a large amount, had been ordered and paid for.

*Eighth.* The interest he had in two islands in Grand River, to which he said he had a good title, and which were a part of the property purchased by Carroll.

Other misrepresentations are also alleged in the bill, relative to the property being unincumbered; relative to steam-

boat stocks; to the building of steamboats to run to and from the village; to the location of a land office at the village by the United States government; to a mail contract, and the like.

The bill further states a failure of title to a saw-mill and water power, conveyed in connection with, and as appertaining to lot number one, on the Campau plat. It also charges a mistake in drawing the deed conveying the real estate, in describing the interest conveyed in lot number twenty-five, on what is called the lower fraction, to be an undivided half, instead of the whole of said lot.

It is seldom a case so complicated in its details, and in which so little regard has been had to common honesty and fair dealing, if we take complainant's bill to be true in all its parts, is presented to a court of equity for adjudication. It also strikes the mind as not a little singular, that complainant should have lain by nearly four years, before filing his bill. I can account for the delay only in this wise: Supposing he had made a good bargain, he was unwilling to relinquish it, on account of the fraud, until the change in the times had stripped the property of its fictitious value, and turned what at first appeared to be a very good bargain, into a very hard one.

Fraud vitiates all contracts, at the election of the party injured; but he must make his election on the discovery of it, or within a reasonable time thereafter, whether he will rescind the contract, or consider it a good and subsisting contract, and seek redress for the injury he has sustained by an action on the case for the deceit. The injured party may pursue either course, on the discovery of the fraud, provided the property is in a situation to be restored to the vendor, in the condition it was in when he parted with it, or the change that has taken place, if any, has arisen from the use of the property, and is too slight of itself to

materially affect its value. If the change is so great that the parties cannot substantially be placed back where they were before the sale, the vendee must seek redress by an action on the case for his damages.

In *Boyce's Executors* v. *Grundy*, 3 *Pet. R.* 215, Mr. Justice Johnson, who delivered the opinion of the court, says : "That a party is bound to be prompt in communicating the fraud when discovered, and consistent in his notice to the opposite party of the use he proposes to make of the discovery, cannot be questioned." And, in *Jones* v. *Disbrow*, the principle so clearly laid down by Mr. Justice Johnson was recognized in this Court, by Chancellor Farnsworth. *Harr. Ch. R.* 102. It is in itself so reasonable, the injured party, having two remedies, either of which he may pursue, but not both, and it so strongly commends itself to the common sense of every man, as to need no labored argument in its support. The difficulty, as is the case with most legal principles, consists in its application ; and the circumstances of each case must furnish the Court with a key for that purpose.

In *Jones* v. *Disbrow*, but a few months had elapsed after the discovery of the fraud, before steps were taken to rescind the contract; and yet the Chancellor in that case said, Disbrow should at once, on the discovery of the fraud, have given notice of his intention to recede from the contract. In the present case, assuming the several charges of fraud to be fully made out by the testimony, not only months, but years, were allowed to pass, after complainant was chargeable with notice of most, if not all the frauds of which he complains, before any steps were taken to rescind the contract. The first steps were to file his bill in this Court. This was the first notice defendants had of the alleged frauds, and of complainant's intention to rescind the contract. Sargeant did not die until Sep-

tember, 1838;—two years and more after the sale;—and yet it does not appear Carroll ever complained to him of the sale of the property.   On the contrary, as late as February, 1838, eighteen months after the sale, a payment of between five and six thousand dollars was made to Sargeant, on complainant's bond and mortgage for the $60,000.

When were the alleged frauds discovered ?   When came they to the knowledge of complainant, or his agents, (for notice to them, I hold, under the circumstances of the case, was notice to him,) who had charge of the property, and were carrying on improvements, and selling lots for him ?   The bill does not state.   It appears from the testimony, however, that Almy & Richmond, Carroll's agents, were in Sargeant's employ at the time of the purchase, and had been for a long time previous.   Almy was the engineer who drafted the village plat, a lithographic copy of which was exhibited to Carroll, showing the location of the property, and the proposed canal, and containing a statement of the water power, and the class of vessels that could navigate the river, both above and below the Rapids.   Almy and Richmond were present at the different interviews between the parties, when they were bargaining for the property.   They are the principal witnesses to the fraudulent representations made by Sargeant, and being, as they were, acquainted with the property, from their previous employment by Sargeant and Lucius Lyon, (Lyon being a joint proprietor with Sargeant,) in keeping their books, selling lots, and otherwise aiding and assisting the proprietors in building up their village, and, after the sale, continuing in the business as the agents of Carroll, they must, from the very nature of their employment, have discovered in a very short time the falsity of Sargeant's representations, had they previously had no

knowledge on the subject. But Almy, at the time of the sale, as he states in his testimony, knew that the village plat on its face misrepresented the navigableness of the river, the depth of water below the rapids, and the average head and fall of the water power to be created by the canal. He knew Sargeant's statement of the amount it would cost to finish the canal to be incorrect. Sargeant, he states, also knew it, and that nearly the whole of the unfinished part of the canal would be rock excavation, which did not appear from the surface of the ground. Of all the alleged misrepresentations, I consider those relating to the canal, the water power, and the navigableness of the river, the most important.

The other misrepresentations were of such a nature, that they could not be kept concealed from Almy and Richmond any great length of time. I refer to the inundation of a part of the village by freshets; the public highway passing diagonally through a number of blocks and injuring the lots, of which they must have known at the time; the amount of moneys due on the contracts assigned; the quantity of building materials; payments for machinery ordered for the mammoth mill; and the like.

Much was said on the argument about the Lyon mortgages. Almy had notice of them as early as the spring of 1838; which was two years before the bill was filed. Lyon, it appears, was at one time the sole proprietor of a part of the real estate, in which an undivided interest was conveyed by Sargeant to Carroll; and, while owning the whole interest, executed the mortgages referred to, and then sold an undivided half of the mortgaged premises to Sargeant. Lyon states in his testimony, the whole property mortgaged, including improvements, is worth from $60,000 to $65,000; and that the amount due on the mortgages is between $8,000 and $9,000. On a foreclosure,

Carroll *v.* Rice.

Lyon's half would be decreed to be first sold, and there can be no doubt it would bring enough to pay the mortgages, without resorting to Carroll's half for that purpose. Still, it must be admitted, the mortgages would be likely to prevent that ready sale of lots, which Carroll must have had in view when he purchased. But Sargeant's statement extended only to his interest in the property; and the difficulty alluded to would have been experienced, more or less, had the mortgages been limited to Lyon's half only. In that case, the purchaser of a lot would have to take an undivided half of it subject to the mortgages, unless a release could be obtained from the mortgagee.

If Carroll, on discovering these mortgages, intended to make them a ground for rescinding the sale, he should have filed his bill immediately. By a change in the times, the property had greatly decreased in value during the four years he held on to the bargain, and he should not now be allowed to throw the loss on Sargeant's representatives, who would not have been benefited by an increased value. Moreover, the property cannot be restored in the condition it was in when the mortgages were discovered, much less when it was purchased by Carroll. For these reasons, I think the sale should not be set aside. But relief may be given to complainant in another way, under the general prayer of the bill. His damages, when ascertained, may, by a decree of the Court, be directed to be endorsed as so much paid, on his bond for the purchase money in the hands of the administrator.

Sargeant's estate is insolvent, unless the whole amount due on the bond is collected. If, then, complainant has sustained damages to a large amount, in consequence of the alleged frauds, (and he has adduced evidence to that effect, and it is my intention to send the question to a jury,) this Court can give more full relief than he can obtain

at law. Besides, two actions at law would be necessary;—an action on the case for the deceit,—and of covenant on the warranty, for the failure of title to the saw-mill and water power, conveyed with, and as part of lot number one, on the Campau plat;—and still leave the question of mistake, for it is nothing more, in the conveyance of lot twenty-three on the lower fraction, to be settled in this Court, should the deed be construed to convey an undivided half only, instead of the whole lot.

I shall therefore direct a case to be made, and sent to the Circuit Court of Kent county for trial; putting in issue the several questions of fraud charged in the bill, and to assess complainant's damages on account thereof, with interest from the time of the purchase;—the location of the land office, and the high price of lumber, and the profits to be made from manufacturing it, to be left out of the case. Sargeant's statements in relation to them were nothing more than expressions of his opinion, and must have been so understood by complainant;—and there is no reason for believing they were not honestly entertained by him at the time. He had so much confidence the land office would be located at the Rapids, he went to the expense of fitting up buildings for the accommodation of the register and receiver. The office was to be located by the government; and complainant knew that fact. Sargeant had no power over it.

The case must also put in issue the failure of title to the saw-mill and water power, conveyed with lot number one on the Campau plat; and the jury, on finding this issue in favor of complainant, (who is to be plaintiff in the case,) must assess his damages, with interest from the time he was deprived of the mill and water power.

The question of mistake in the conveyance of lot twen-

Carroll *v.* Rice.

ty-three, need not be submitted to the jury. That will be disposed of on the final hearing.

The case must be settled by a Master, if the parties cannot agree in making it up. Either party may notice it for trial; and either party on the trial may examine any witness whose testimony was read on the hearing, or read the deposition of such witness if he be dead. Either party may examine new witnesses, and read the deposition of any witness of the opposite party that was read on the hearing; and the trial must be by a struck jury, if requested by either party.